Morton L. Fearey v. Commissioner.
Fearey v. Commissioner
Docket No. 110614.
United States Tax Court
1943 Tax Ct. Memo LEXIS 266; 2 T.C.M. (CCH) 237; T.C.M. (RIA) 43276; June 8, 1943
*266 Morton L. Fearey, 70 Pine St., New York City, pro se. Oliver W. Tell, Esq., for the respondent. LEECH Memorandum Opinion LEECH, Judge: Resepondent determined a deficiency in petitioner's income tax for the calendar year 1938 in the amount of $607.52. In his income tax return for that year, filed with the collector of internal revenue for the Second District of New York, the petitioner deducted $3,036.75, which was 50 per cent of an alleged loss of $6,073.50, based upon a sale by petitioner in the taxable year of 4.74 shares of common stock of the Middle West Corporation, together with warrants for the purchase of 4.74 shares of the common stock of that corporation. Respondent disallowed the loss on the ground that the 474 shares of common stock of Middle West Utilities Company, in consideration for which petitioner had received his stock and warrants in the Middle West Corporation, had become worthless in 1932. Accordingly respondent, in addition to disallowing the asserted loss, increased petitioner's gross income for 1938 by the addition of $14.40, which was 50 per cent of $28.80, the net proceeds received by petitioner upon the sale of his stock and warrants in the taxable *267 year. The correctness of these actions of the respondent presents the only issue. [The Facts] The facts are found as stipulated. The petitioner is an individual residing in the Town of Hempstead, Nassau County, New York. He is a practicing attorney at law, maintaining his offices therefor in the City of New York. Prior to the year 1931, petitioner acquired 474-368/400 shares of the common capital stock of Middle West Utilities Company (hereinafter called "Middle West") by purchase and as stock dividends. Their cost basis to petitioner was $6,132.50. Middle West was a holding company incorporated under the laws of Delaware. Its assets consisted largely of the stocks and bonds of various subsidiaries engaged in the business principally of supplying electric service. On April 15, 1932, an involuntary petition in bankruptcy was filed in the District Court of the United States for the Northern District of Illinois, Eastern Division, praying that Middle West be adjudicated a bankrupt. On the same date, April 15, 1932, the United States District Court for the Northern District of Illinois, Eastern Division, appointed receivers in equity of Middle West. Receivership was brought *268 about as a result of the company's inability to finance its obligations, including some $27,500,000 of bank loans and $10,000,000 of 5 per cent notes due June 1, 1932. On April 16, 1932, the United States District Court of Delaware named the same receivers and another as receivers for the company's property in Delaware. The company's receivers caused ancillary proceedings to be instituted in the jurisdictions where the company's properties were located and secured the appointment of ancillary receivers in 20 Federal judicial districts. There was no adjudication of bankruptcy or non-bankruptcy of Middle West in any of the foregoing proceedings. The preferred stock of Middle West was quoted on the market during the month of December 1932 at a price range of 50 cents to $1.75 per share; the price range December 30, 1932, was 50 cents to 75 cents per share, and during the succeeding week was 50 cents to 75 cents per share. The common stock of Middle West was quoted on the market during the month of December 1932 at a price range of 12 1/2 cents to 37 1/2 cents per share; the price December 30, 1932 was 12 1/2 cents per share; and the price during the succeeding week was 12 1/2 cents to *269 25 cents. During the year 1933 the quoted high and low on the preferred stock of Middle West was $3.50 and 12 1/2 cents, respectively, and the high and low on the common stock of said company was 75 cents and 12 1/2 cents, respectively. Upon the filing on June 7, 1934, of petitions under section 77B of the Bankruptcy Act for reorganization of Middle West, the United States District Court on July 23, 1934, appointed a trustee of the properties of the company and appointed an appraiser to determine the value of the assets of the company as of July 23, 1934. The appraiser determined the total value of the assets of Middle West on July 23, 1934, and based upon the appraisal these assets as of June 30, 1935, were of the value of $50,973,827, which was less than the liabilities of the company to creditors. On the basis of this value, the liabilities to creditors of the company exceeded the total value of the assets of the company by the amount of $15,211,578 on June 30, 1935. A plan of reorganization of Middle West dated September 24, 1934, as amended, filed in these proceedings in the United States District Court under section 77B of the Bankruptcy Act, was confirmed and made effective *270 by decree and order of final confirmation of the United States District Court entered on November 27, 1935. Under the plan of reorganization each holder of preferred stock of the debtor was allowed one share of common stock ( $5 par value) of the new company and a stock purchase warrant for one share of common stock of the new company for each four of the preferred shares of stock of the debtor and each holder of common stock (no par value, stated value $10) of the debtor was allowed one share of common stock ( $5 par value) of the new company and stock purchase warrant for one share of the stock of the new company for each 100 shares of common stock of the debtor. The common stockholders of the old company were thus given 158,829 shares of stock in the new company, together with the right to purchase a like additional number of shares, and the preferred stockholders of the debt were given 151,928 shares of stock in the new company, together with the right to purchase a like additional number of shares. The stock purchase warrants constituted a right to purchase a share of common stock of the new company for $8 per share if exercised on or before December 31, 1936, or $9 per share *271 if exercised on or before December 31, 1937, or $10 per share if exercised on or before December 31, 1938. The new company was to issue to various classes of creditors and stockholders a total of 3,310,757 shares of such common stock and to reserve for issue against exercise of stock purchase warrants 310,757 shares. The market price range of the stock of the new company on November 27, 1935, the date of the decree confirming the plan of reorganization, was $8 to $8.25 per share, and the market price range on the same date of the stock purchase warrants was $3.25 to $3.75 per warrant. The market price range on the same date for the common stock of the old corporation was from 12 1/2 cents to 25 cents per share, and the market price range on that date on the $6 cumulative preferred stock was $2.50 per share to $3 per share. The right of holders of both the preferred and common stock of Middle West to exchange such stock for common stock of the new company and warrants to purchase such new common stock on the basis hereinabove set out, expired pursuant to a decree and order of the United States District Court for the Northern District of Illinois, Eastern Division, on December 31, *272 1938. The time to exercise the warrants to purchase stock of the new company expired December 31, 1938. On or about November 8, 1938, petitioner pursuant to the plan of reorganization surrendered 474 shares of common capital stock of Middle West and received in exchange therefor 4.74 shares of the common capital stock of the Middle West Corporation (hereinafter called the "Corporation") and stock purchase warrants for 4.74 shares of the common stock of the Corporation. On December 3, 1938, through the brokerage firm of D. T. Moore & Company, petitioner sold over-the-counter, for cash, his 4.74 shares of the Corporation together with the stock purchase warrants therein to which reference has above been made for the gross sum of $30.81. Out of this sum petitioner paid the brokerage commission on the sale in the sum of $1.85, U.S. stock transfer stamp tax of 4 cents, and New York stock transfer tax of 12 cents, and received as the net proceeds of such sale the sum of $28.80. This sale was at arm's length and in good faith. Petitioner has never taken the position that the stock of Middle West or the Corporation became worthless prior to 1938, nor has he ever claimed any loss or deduction *273 in connection with his holdings in either of these companies for any year prior to 1938. The common stock of Middle West was listed on the Chicago Stock Exchange and New York Curb Exchange continuously throughout the entire period from the beginning of receivership in 1932 (through the date of reorganization in 1935) until February of 1936. The range in prices and volume of sales subsequent to the receivership of Middle West of said common stock on both exchanges (combined statistics) until February 15, 1936, may be summarized as follows: Period
Shares Traded High Low
1932 Subsequent to Receivership (4/16/32 - 12/30/32)
820,100
1
1/8
1933 (12/31/32 - 12/29/33)
841,247
3/4
1/16
1934 (12/30/33 - 12/28/34)
682,681
1/2
1/16
1935 (12/29/34 - 12/27/35)
768,150
7/16
1/16
1936 (12/28/35 - 2/14/36)
1,616,600
3/8
1/8
Total
4,728,778
The common stock and warrants of the Corporation, the new company resulting from the reorganization of Middle West, were admitted to trading on the Chicago Stock Exchange on February 1936, and on the New York Curb Exchange on April 14, 1938. The high and low price and the number of shares of the common stock of the new company, as *274 well as the high and low price and number of warrants to purchase common stock of the new company traded on the New York Curb Exchange during 1938 were as follows: No. of
Shares or
Warrants
High
Low
traded
Common stock:
8 3/8
4 7/8
64,760
Warrants
1
1/16
19,200
Seventy-eight hundred shares of stock in the Corporation were sold on the Curb Exchange in New York City on February 24, 1934 at prices varying from a low of 6 1/4 to a high of 6 3/4. [1]
The high and low price of the shares of the common stock of the Corporation, as well as the high and low price of warrants to purchase common stock of the Corporation traded on the Chicago Stock Exchange each year for the years indicated were as follows: STOCK OF NEW COMPANY (Middle West Corporation) Year
High
Low
1936
13 3/4
7
1937
15 7/8
3 5/8
1938
8 1/4
4 1/8
WARRANTS TO PURCHASE STOCK OF NEW COMPANY Year
High
Low
1936
7 1/8
3 1/8
1937
7 3/4
3/4
1938
2
.03
After February 13, 1936, the shares of Middle West continued to be traded *275 in until the end of 1938 on the over-the-counter market and their value was based on the value of the stock of the Corporation, into which the former stock was exchangeable. The number of shares of stock of the Corporation traded in during the period from February 14, 1936 through 1937 was substantially the same as the corresponding figure for 1938. During 1936, 1937 and 1938, following their removal from listing on the Chicago Stock Exchange and the New York Curb Exchange, the shares of Middle West were traded over-the-counter in considerable number. Among the brokerage concerns dealing in these shares were Josephthal & Co. and Panie, Weber & Co., members of the New York Stock Exchange; Swift, Henke & Co., members of the Chicago Stock Exchange; Hickey, Doyle & Co. of New York and Chicago; Fuller, Crutterden & Co., D. J. Miller & Co. of New York; Euyart, Van Camp & Feil of Chicago, and others. During this period the bid and asked prices of the old company common varied from as high as 16 cents a share to as low as 4 cents a share in the latter part of 1938. Petitioner's common stock in Middle West had not become worthless when exchanged for stock and warrants in the Corporation *276 nor had such become worthless when they were sold in 1938. [Opinion] The position of the respondent is that the stock which petitioner owned in Middle West, in exchange for which in 1938 he received the stock and warrants sold in that year, became worthless in 1932 and as a result thereof the stock and warrants sold by petitioner in 1938 then had a basis of zero to petitioner so that upon his sale thereof in that year no loss was sustained but, on the other hand, income was realized in entire amount of the net proceeds received in the sale. As we understand the respondent's contention, it is admitted that unless petitioner's stock in Middle West did become worthless in 1932 or prior to 1938, when petitioner sold the stock and warrants received in exchange for his stock in Middle West, he was in error in making the adjustments which resulted in the contested deficiency. Revenue Act of 1938, section 23 (c)(2), and (g)(1), and section 117. In support of his position, respondent argues that "The essential facts involved herein have been considered four times by this Court, once by the Circuit Court of Appeals for the Second Circuit, and once by the United States District Court *277 for the District of New Jersey". See ; ; Benjamin Mahler, Docket Nos. 88448 and 90842, Memorandum Opinion entered October 24, 1939; affd., ; cert. denied, ; , (on appeal, C.C.A., 3rd Cir. [2]). In the Horning case, supra, the Board of Tax Appeals, now this Court, held that petitioner failed to carry his burden of establishing that his preferred and common stock in Middle West became worthless in 1932, since no identifiable event establishing that worthlessness was proved. In the Peabody case, the Board held that the petitioner there had sustained her burden and established that the preferred and common stock in that company did become worthless in 1932. In the Mahler case, we followed the Peabody decision. Upon appeal, the Second Circuit *278 Court of Appeals affirmed so much of our decision as held that the common stock of Middle West became worthless in 1932, and reversed the decision as to the 1932 worthlessness of the preferred stock, holding that the latter stock did not become worthless until 1934. In the G.E. Employees Securities Corp. case the plaintiff contended that it sustained a loss in the sale of its Middle West stock when it sold it in 1936. The position of the respondent was that it became worthless in 1932. The court sustained the respondent. Petitioner points to our memorandum decision in Rex E. Beach, Docket No. 107408, entered August 10, 1942, in which this Court, then the Board of Tax Appeals held that the common stock of Middle West did not become worthless in 1932 and that the petitioner sustained a loss in 1938 when he sold his stock. Obviously res adjudicata is not involved. The decision of this case, therefore, as any other factual dispute, must rest solely upon the record before us. . Except for the evidence in the C.E. Employees Securities Corp. case and that in Rex E. Beach, supra, *279 we think the record here is more full, at least, upon the quantum of trading in the stock of Middle West and the Corporation following 1935. See . With all due respect to the District Court of New Jersey which decided , we do not agree with its decision in that case. Among other cases upon which respondent relies is . We think the facts in that case widely differ from those here, and that the opinion of the Second Circuit there rather supports the position of the petitioner here. The court there said: * * * However, while the security remains in esse and its value may fluctuate, it is well settled that only by a sale can gain or loss be established. * * *; , * * *; , * * *; U.S. v. White Dental Mfg. Co., supra, 401 of 274 U.S. Moreover, we understand *280 this to be not merely a rule of convenience, but to inhere in the essence of income arising from capital gains or losses. Nevetheless, we think it inapplicable when the security can no longer fluctuate in value, because its value has become finally extinct. In such cases a sale is necessarily fictitious; it establishes nothing and cannot be intended to do so, for there is no variable to determine. * * * Whatever may be said as to the intrinsic value of the securities involved here, at any time prior to the date of their sale in 1938, we think the stock had potential value. See , pages 1278 and 1279, affd., . It was relatively small, it is true, but not so small as to prevent petitioner from realizing net proceeds from its sale. Cf. That value was real. It was fixed by the opinions of free purchasers who backed those opinions with their money in an open market where the quantities dealt in leave no doubt as to its substance. The petitioner in good faith and in an arm's length transaction sold his stock on that market. *281 He has never taken a position inconsistent with his present one. We fully agree with our decision in the Rex E. Beach case, supra. Accordingly, we have found as a fact that petitioner's common stock in Middle West had not become worthless when exchanged for stock and warrants in the Corporation nor had such stock and warrants become worthless when they were sold in 1938. It follows that petitioner is entitled to the contested deduction. Revenue Act of 1938, section 23 (e)(2) and (g)(1), and section 117. Decision will be entered under Rule 50.
Footnotes
1. This fact was established by evidence at the hearing and was the only fact upon which testimony was offered at the hearing.↩
2. District Court decision reversed and remanded by CCA-3, .↩